2020R00458/MNL/ALW



FILED

OCT 11 2024

AT 8:30 ___ 4:32 P M
CLERK, U.S. DISTRICT COURT - DNJ

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. (CCC) |
| | : | |
| v. | : | Crim. No. 24-682 |
| | : | |
| CHRISTOPHER JAMES SCANLON | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. § 1960(b)(1)(B) |

INDICTMENT

The Grand Jury in and for the District of New Jersey, sitting at Newark, charges as follows:

BACKGROUND

1. At all times relevant to this Indictment:

Statutory and Regulatory Background

a. The United States Treasury Department was a United States executive agency responsible for promoting economic prosperity and ensuring the financial security of the United States.

b. The Financial Crimes Enforcement Network ("FinCEN") was a bureau of the United States Treasury Department. FinCEN's mission was to safeguard the United States financial system from illicit use, combat money laundering, and promote national security through the collection, analysis, and dissemination of financial intelligence and strategic use of financial authorities. FinCEN carried out its mission, in part, by receiving and maintaining financial transaction data, and analyzing and disseminating that data for law enforcement purposes.

  c. FinCEN had the authority to implement, administer, and enforce compliance with the Bank Secrecy Act ("BSA") and associated regulations. FinCEN was responsible, in part, for detecting and deterring financial crime.

  d. Under Title 31, United States Code, Section 5330 and accompanying regulations, any person who owned or controlled a money transmitting business ("MTB") had to register the business (whether or not the business was licensed as a money transmitting business in any state) with the Secretary of the Treasury not later than the end of the 180-day period beginning on the date on which the business was established. This registration was accomplished with FinCEN.

  e. Under Title 31, United States Code, Section 5330(d), a money transmitting business included a business, other than a depository institution or the U.S. Postal Service, that provided money transmitting or remittance services or any other person who engaged as a business in the transmission of currency, funds, or value that substituted for currency. *See also* 31 C.F.R. § 1010.100(ff)(5).

  f. Under Title 18, United States Code, Section 1960, it was a felony to knowingly conduct, control, manage, supervise, direct, or own all or part of an unlicensed money transmitting business. The statute defined "money transmitting" to include transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier. 18 U.S.C. § 1960(b)(2). "Unlicensed money transmitting business" was defined to include, among other things, a money transmitting business that was not registered as such with the Secretary of the Treasury as required under

Title 31, United States Code, Section 5330 or regulations prescribed thereunder, or a money transmitting business that otherwise involved the transportation or transmission of funds that were known to the defendant to have been derived from a criminal offense or intended to be used to promote unlawful activity.

<u>Relevant Individuals and Entities</u>

g.  Defendant CHRISTOPHER JAMES SCANLON ("SCANLON") was a United States citizen who, at times during the schemes described herein, resided in Utah, and maintained a residence in Florida.

h.  SCANLON was the President, Chief Executive Officer, and Founder of the brands Aurae Lifestyle and Club Swan. SCANLON was also the owner of PMA Media Group, Inc. ("PMA"), and the indirect owner of AU Card, LLC, Nvayo LTD. ("Nvayo"), and AU Card Ltd. (collectively, the "AU Entities"). SCANLON also acted as a "relationship manager," i.e., customer service representative, for several high-net-worth Aurae Lifestyle customers.

i.  Co-Conspirator-1 was a United States citizen who resided and worked in Utah. Co-Conspirator-1 was a licensed attorney. From in or around 2014 through at least in or around 2019, Co-Conspirator-1 was the Chief Compliance Officer of AU Card, LLC. In or around 2019, Co-Conspirator-1 became a director of Nvayo and a member of Nvayo's Operating Board. Co-Conspirator-1 also served as the Chief Legal Officer of PMA, AU Card, LLC, and Nvayo.

j.  PMA was incorporated in Delaware with its principal place of business in Utah. SCANLON owned PMA and served as its Director. PMA directly owned AU

Card, LLC and indirectly owned Nvayo, among other entities. PMA employed several individuals who worked together to create Aurae Lifestyle. Several of these employees resided and worked in the United States, including Co-Conspirator-1. PMA was not registered as an MTB with FinCEN.

  k. AU Card, LLC, which did business as "Aurae Lifestyle," and "Club Swan," was a Delaware limited liability company with its principal place of business in Utah. SCANLON was the Director of AU Card, LLC. AU Card, LLC was the 100% owner of AU Card Ltd., a pass-through entity used to enter into contracts. AU Card Ltd. was the direct owner of Nvayo. Neither AU Card, LLC nor AU Card Ltd. were registered as an MTB with FinCEN.

  l. Nvayo was a company registered in the United Kingdom. Nvayo was wholly owned by AU Card Ltd. and indirectly owned and controlled by SCANLON. Nvayo maintained a license in the United Kingdom to provide electronic, or "e-money," wallets on behalf of Aurae Lifestyle customers. AU Card Ltd. acquired Nvayo in or around August 2017. Nvayo was not registered as an MTB with FinCEN.

  m. Aurae Lifestyle was a brand under which the AU Entities operated. Through Aurae Lifestyle, SCANLON and the AU Entities provided luxury services—including financial services and concierge travel services—to members who were typically high-net-worth individuals.

  n. Customer-1 was a resident of New Jersey and a customer of Aurae Lifestyle. In or around 2021, Customer-1 pleaded guilty for conspiring to violate the

4

federal anti-kickback statute and conspiring to defraud the IRS in violation of federal law.

o.   Customer-2 was a resident of California and a customer of Aurae Lifestyle. Customer-2 was previously convicted in or around 2001 for conspiring to engage in mail and wire fraud in violation of federal law, which conviction arose in connection with a long distance phone card scam. In or around 2018, the U.S. Securities and Exchange Commission ("SEC") brought a civil enforcement action against Customer-2 and his entity ("Fraud Entity-1") alleging various federal securities violations that occurred between in or around October 2015 and in or around 2017 ("Fraud Scheme-1"). The SEC alleged that Fraud Scheme-1 was a Ponzi and pyramid scheme. In or around 2023, the SEC achieved a settlement with Customer-2 and Fraud Entity-1, which required Customer-2 and Fraud Entity-1 to jointly and severally disgorge more than approximately $20 million.

p.   Customer-3 was a resident of Colorado and a customer of Aurae Lifestyle. In or around December 2019, Customer-3 was charged in a federal indictment ("Indictment-1") with conspiracy to commit wire fraud in connection with a large-scale cryptocurrency mining scheme ("Fraud Scheme-2"), which took place between in or around 2014 and in or around December 2019.

q.   Customer-4 was a citizen of the United States and a customer of Aurae Lifestyle. In or around December 2019, Customer-4 was charged in Indictment-1 with conspiracy to commit wire fraud in connection with Fraud Scheme-2.

r.  Lawyer-1 was an attorney licensed to practice law in Utah and a customer of Aurae Lifestyle. Lawyer-1 assisted Customer-3, Customer-4, and others with transmitting significant amounts of money obtained through Fraud Scheme-2, including through Lawyer-1's Aurae Lifestyle account.

s.  Bank-1, Bank-2, and Bank-3 were U.S. financial institutions. SCANLON opened business bank accounts in the name of AU Card, LLC at Bank-1 in or around April 2014 ("AU Bank-1 Account"), at Bank-2 in or around February 2019 and in or around December 2018, and at Bank-3 in or around March 2019. Co-Conspirator-1 was added as a signatory to the business accounts with Bank-1 and Bank-2 and opened several bank accounts in the name of AU Card, LLC at Bank-3.

t.  Cryptocompany-1 and Cryptocompany-2 were cryptocurrency trading companies with principal places of business in Illinois and New Jersey, respectively. Cryptocompany-1 and Cryptocompany-2 maintained business relationships with AU Card, LLC.

u.  Cryptocompany-3 was a financial services company that provided cryptocurrency banking services with a principal place of business in California. Cryptocompany-3 maintained a business relationship with AU Card, Ltd. through SCANLON and others.

v.  All wire transfers processed through the Fedwire Funds Service ("Fedwire") were processed in a way that caused an electronic communication to travel through a Federal Reserve facility in New Jersey.

<u>The Conspiracy</u>

2.  From at least in or around 2015 through in or around November 2019, in the District of New Jersey, and elsewhere, the defendant,

CHRISTOPHER JAMES SCANLON,

knowingly and intentionally conspired and agreed with Co-Conspirator-1 and others to conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, contrary to Title 18, United States Code, Section 1960(b)(1)(B).

<u>Goal of the Conspiracy</u>

3.  It was the goal of the conspiracy for SCANLON, along with Co-Conspirator-1 and others, to operate the AU Entities as a business that conducted financial transactions for its customers without registering as an MTB with FinCEN and for the purpose of financial gain.

<u>Manner and Means of the Conspiracy</u>

4.  It was part of the conspiracy that:

    a.  SCANLON directed the AU Entities to provide fiat and cryptocurrency financial services to their customers, including by (1) transferring fiat and cryptocurrency to third parties on behalf of, and sometimes between, their customers; and (2) liquidating cryptocurrency on behalf of their customers.

    b.  SCANLON knowingly conducted, controlled, managed, supervised, and directed the AU Entities to transmit their customers' funds. SCANLON also acted as a "relationship manager" (i.e., a customer service

representative) for several high-net-worth Aurae Lifestyle customers. SCANLON knew that the AU Entities conducted financial transactions on behalf of Aurae Lifestyle customers and directed them to do so.

      c.    For instance, in or around January 2019, SCANLON sent an email to several employees of the AU Entities in which he stated: "It has been a business wide effort in producing a truly world class 'challenger bank' type application, with the added benefit of being able to liquidate crypto currency through our concierge arm." SCANLON touted how the AU Entities had "[p]rocessed and maintained financial control over the many millions of dollars of member load, transfer, and wire transactions which account for over 95% of our net income."

      d.    The AU Entities were marketed on social media platforms as operating from the United States and targeted United States customers. For example, in or around December 2019, Aurae Lifestyle posted a picture on its social media account of an Aurae Lifestyle debit card that included the phrase "Sweet Home Alabama," and the text, "Aurae Members have access to financial services tailored to high net worth clients, 24/7 dedicated lifestyle manager, exclusive lifetime experiences and more." The post was represented to be made from New York, New York.

      e.    In or around March 2020, Aurae Lifestyle posted a listing of Aurae Lifestyle's services for its customers on its social media account. The list of services – which Aurae Lifestyle claimed to provide "24/7" – included "Wire Transfers" and "Bitcoin Liquidation."

    f. Although Aurae Lifestyle (1) served and marketed itself to United States customers; and (2) engaged in money transmitting on behalf of United States customers, none of the AU Entities were registered as MTBs with FinCEN.

    g. In exchange for access to the financial services offered by the AU Entities, customers were charged high fees to become "members" of Aurae Lifestyle and to conduct financial transactions through their Aurae Lifestyle accounts. For example, in or around July 2018, AU Card, LLC issued an invoice to Customer-4, with a listed address in Nevada, in the approximate amount of $28,000 for an Aurae Elite Lifestyle membership and a custom 14-karat yellow gold MasterCard. AU Card, LLC's bank account at Bank-2 was listed at the bottom of the invoice, along with instructions to wire the funds to the Bank-2 account.

    h. In addition to the high "membership" fees and expensive debit cards, customers were charged significant fees to conduct fiat wire transfers, sometimes approximately 1% of the amount of the wire.

    i. The AU Entities also used accounts at Bank-1, Bank-2, and Bank-3 to provide money transmitting services to their customers while creating the false impression in their interactions with the banks that they were conducting transactions for their own benefit and not on behalf of their customers. For example, as alleged in Paragraph 5(b)(iv) below, on or about December 9, 2019, SCANLON used Bank-2, Bank-3, and Cryptocompany-1 to orchestrate an exchange of approximately 470 Bitcoin to approximately $2.5 million without disclosing to any of those entities that they were assisting in liquidating Bitcoin for Customer-3.

j. The AU Entities also maintained accounts at several U.S.-based cryptocurrency companies, including Cryptocompany-1 and Cryptocompany-2, to facilitate money transmitting services to their customers that involved cryptocurrency. In this way, the AU Entities were able to conduct cryptocurrency exchanges on behalf of their customers through AU Entity-held accounts at Cryptocompany-1 and Cryptocompany-2, thus concealing their customers' actual identities from the relevant cryptocurrency exchange. For example, on or about August 26, 2019, on behalf of Customer-3, SCANLON used an AU Card, LLC account at Cryptocompany-1 to convert approximately 22,000 Litecoin into Bitcoin.

k. In total, in or around 2018, AU Card, LLC engaged in over approximately 160 digital asset trades on behalf of AU Card, LLC customers that involved over approximately $150 million, including transactions conducted on behalf of Customer-3 and Customer-4. In or around 2019, AU Card, LLC engaged in over approximately 5,900 digital asset trades on behalf of AU Card, LLC customers that involved over approximately $35 million, including transactions conducted on behalf of Customer-3 and Customer-4.

l. As part of the unlawful money transmitting conduct described above, from in or around January 2018 through in or around January 2019, the AU Bank-1 Account received more than approximately $157 million from a bank account controlled by Cryptocompany-1, and AU Card, LLC wired approximately $1.3 million to a bank account controlled by Cryptocompany-1 from the AU Bank-1 Account.

    m. Similarly, from in or around February 2019 through in or around April 2019, an AU Card, LLC Bank-2 account received more than approximately $13 million from a bank account controlled by Cryptocompany-1, and AU Card, LLC wired approximately $1.6 million to a bank account controlled by Cryptocompany-1 from the AU Card, LLC Bank-2 account.

Overt Acts

  5. In furtherance of the conspiracy, and to achieve its illegal objectives, SCANLON and others committed and caused to be committed the following overt acts in the District of New Jersey and elsewhere:

    a. In or around June 2018, SCANLON orchestrated a transfer of approximately $300,000 from Customer-1 to Customer-2. Specifically, on or about June 5, 2018, Customer-1 flew to southern California, where Customer-1 picked up cash generated by Customer-1's marijuana distribution business. SCANLON then helped to arrange a meeting between Customer-1 and Customer-2, during which Customer-1 gave approximately $300,000 in cash to Customer-2. On or about June 6, 2018, at SCANLON's direction, Aurae Lifestyle credited approximately $300,000 to Customer-1's Aurae Lifestyle account and debited approximately $300,000 from Customer-2's Aurae Lifestyle account.

    b. Between in or around August 2019 and in or around November 2019, SCANLON arranged and conducted financial transitions involving Customer-3's funds derived from Fraud Scheme-2. For example:

i. In or around August 2019, Customer-3 asked SCANLON to send money to another Aurae Lifestyle customer's account because Customer-3 had not properly completed "Know Your Customer" documentation, purportedly required by Nvayo, before Customer-3 could send the money directly through his account.

ii. Thereafter, on or about August 26, 2019, as a separate transaction, Customer-3 asked SCANLON to convert approximately 22,000 Litecoin, a type of cryptocurrency, worth approximately $1.7 million, into Bitcoin for Customer-3. Customer-3 also asked SCANLON to keep the cryptocurrency transaction off of the ledger of Customer-3's Aurae Lifestyle account because Customer-3 wanted the transaction to appear "nowhere." SCANLON agreed to keep the transaction off of the books. Customer-3 confirmed: "So for sure? Ghost!...If not I have to treat differently. So need to know for sure." SCANLON replied, "No attachment at all...Doesn't hit fiat." SCANLON and Customer-3 then exchanged e-money wallet addresses.

iii. On or about the same date, SCANLON carried out the exchange requested by Customer-3. SCANLON asked Cryptocompany-1 to exchange approximately $1.7 million

worth of Litecoin to Bitcoin in an account maintained by AU Card, LLC at Cryptocompany-1. SCANLON did not inform Cryptocompany-1 that he requested the exchange on behalf of Customer-3. After the transaction was completed, Customer-3 confirmed to SCANLON: "Boom! Received!" and asked SCANLON to confirm that the transaction was not posted on the ledger of his Aurae Lifestyle account: "Ghost, right?" SCANLON replied: "Boo."

iv. On or about December 9, 2019, SCANLON liquidated Bitcoin on behalf of Customer-3. Customer-3 sent approximately 470 Bitcoin, worth approximately $2.965 million, to a cryptocurrency wallet, which SCANLON provided. To complete this transaction, SCANLON directed AU Entities employees to transfer approximately $2.965 million from an AU Card, LLC network account at Bank-3 to an AU Card, LLC operating account at Bank-3. SCANLON then instructed the employees to send approximately $2.965 million from the Bank-3 operating account to an account held by AU Card, LLC at Bank-2. SCANLON instructed further that, once the funds arrived in the Bank-2 account, the employees were to wire

        approximately $2.5 million from the Bank-2 account into a bank account provided by Customer-3. Neither SCANLON nor the AU Entities employees informed either Cryptocompany-1 or Bank-3 that the transaction was being conducted on behalf of Customer-3.

c.    From in or around October 2019 through in or around November 2019, SCANLON orchestrated wire transfers for Customer-4. For example:

    i.    In or around 2019, Customer-4 asked SCANLON to wire approximately $400,000 from his Aurae Lifestyle account to a bank account in Cambodia. This transaction was flagged by Nvayo's compliance department.

    ii.    On or about abut July 12, 2019, Nvayo filed a report with a regulator in the United Kingdom restricting the $400,000 transaction because Customer-4 was a noncompliant registered sex offender, was alleged to be part of a Ponzi scheme, and Customer-4's funds were suspected proceeds of a fraudulent activity.

    iii.    Thereafter, SCANLON worked with Customer-4 to find a way to work around the restrictions. From in or around July 2019 until in or around November 2019, SCANLON and Customer-4 exchanged chats and audio messages about Customer-4 providing source of funds documentation

14

|  |  |
|---|---|
|  | regarding the $400,000 wire transaction. On or about October 21, 2019, SCANLON sent employees of the AU Entities an attestation falsely claiming that Customer-4 was a practicing attorney licensed in Utah and had received approximately $3 million for participating in three speaking engagements. SCANLON knew the attestation was false. |
| iv. | On or about September 3, 2019, Customer-4 asked SCANLON to convert 100 Bitcoin to U.S. dollars. Customer-4 requested that SCANLON transfer the fiat currency into the Aurae Lifestyle account of a third party to obscure Customer-4's ownership. On or about September 4, 2019, SCANLON told Customer-4 that $1,055,000 was credited to the third party's Aurae Lifestyle account and asked Customer-4 to tell the third party to send SCANLON invoices for that amount so he could process a wire transfer for the third party. |

In violation of Title 18, United States Code, Section 371.

## FORFEITURE ALLEGATION

Upon conviction of the offense charged in this Indictment, SCANLON shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offense.

## SUBSTITUTE ASSETS PROVISION

If any of the property described above, as a result of any act or omission of SCANLON:

    a. Cannot be located upon the exercise of due diligence;

    b. Has been transferred to or sold to, or deposited with, a third party;

    c. Has been placed beyond the jurisdiction of the court;

    d. Has been substantially diminished in value; or

    e. Has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(a)(1) and Title

28, United States Code, Section 2461(c), to seek forfeiture of any other property of such defendants up to the value of the forfeitable property described above.

A TRUE BILL

███████████

FOREPERSON

*Philip R. Sellinger*
PHILIP R. SELLINGER
United States Attorney

CASE NUMBER: 24 6 8 2 (CCC)

**United States District Court**
**District of New Jersey**

**UNITED STATES OF AMERICA**

v.

**CHRISTOPHER JAMES SCANLON**

**INDICTMENT FOR**

18 U.S.C. § 371
18 U.S.C. § 1960(b)(1)(B)

A True Bill,



Foreperson

PHILIP R. SELLINGER
*UNITED STATES ATTORNEY*
*FOR THE DISTRICT OF NEW JERSEY*

MEGAN LINARES
AARON WEBMAN
*ASSISTANT U.S. ATTORNEYS*
*973-645-2700*